**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James C. CARR (92–3767) and Carmen
C. Clair (92–3768), Defendants–
Appellants.**

Nos. 92–3767, 92–3768.

United States Court of Appeals,
Sixth Circuit.

Argued June 28, 1992.

Decided Sept. 28, 1993.

James A. Wilson, Asst. U.S. Atty., Dale Ann Goldberg (briefed and argued), Office of the U.S. Atty., Dayton, OH, for plaintiff-appellee.

Dennis L. Bailey (briefed and argued), Dayton, OH, for James C. Carr.

Ronald E. Reichard (briefed), Dayton, OH, for Carmen C. Clair.

Before: RYAN and BOGGS, Circuit Judges, and ROSEN, District Judge.*

RYAN, Circuit Judge.

The defendants, James C. Carr and Carmen C. Clair, appeal following the judgments and sentences entered against them after

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

they were found guilty by a jury on multiple bank fraud-related charges. On appeal, both defendants present numerous challenges to their convictions, and Carr also raises challenges to his sentence. We conclude that the arguments of both defendants with respect to their convictions are without merit, and therefore affirm the judgments. However, a number of Carr's challenges to the sentencing procedure are meritorious. We therefore vacate Carr's sentence and remand for re-sentencing.

## I.

Carr and Clair were named in a 24–count indictment in which Carr was charged with thirteen counts of bank fraud, in violation of 18 U.S.C. §§ 2 & 1344, and one count of conspiracy to commit bank fraud and to possess stolen mail, in violation of 18 U.S.C. § 371, and in which Clair was charged with thirteen counts of bank fraud, in violation of 18 U.S.C. §§ 2 & 1344, seven counts of possession of stolen mail, in violation of 18 U.S.C. § 1708, and one count of conspiracy to commit bank fraud and to possess stolen mail, in violation of 18 U.S.C. § 371. Both defendants pled not guilty to all counts. Co-defendants Shirley Scott and Deborah Tarrance were also charged, but pled guilty and testified against Carr and Clair.

From May 1987 through August 1988, the defendants were involved in a scheme in which they approached a number of people in Dayton, Ohio, and convinced them to let Carr and Clair have use of their automatic teller machine (ATM) cards. Sometimes the defendants would approach a person together, while on other occasions they operated separately. Often they would use multiple three-way telephone calls to persuade the person to cooperate. When an individual relinquished the ATM card to the defendants, they would then use the card to deposit money into the card owner's checking account. The money came from checks that had been stolen from authorized mail depositories in various Columbus, Ohio, office buildings. Carr and Clair would withdraw the money before it was discovered that the balance was fraudulent, sometimes using the ATM card to do so, and other times accompanying the account-

holder to the bank and instructing him or her to withdraw a certain amount. In the latter event, the defendants would give a small amount of the money to the accountholder, and keep the rest.

A variety of individuals were involved in the scheme along with the defendants. Most were simply targets for the defendants' fraudulent scheme, active only insofar as they permitted the defendants access to their accounts; others assisted in recruiting new accountholders. The accountholders provided a great deal of the evidence against the defendants by testifying at trial. The evidence against the defendants included Clair's fingerprints and handwriting on the stolen checks. Furthermore, although Carr was incarcerated between June and November 1987, and so incapable of making direct personal contact with some of the individuals involved in the scheme, records produced at trial indicated that a number of those cooperating in the scheme visited Carr in jail, and further, that Clair visited Carr almost daily. Telephone records showed daily collect telephone calls from the jail to Clair's residence, as well as three-way calls between Clair's residence, the jail, and the houses of some of those cooperating in the scheme. Finally, Clair made frequent deposits to Carr's commissary account during July 1987, totalling more than $2,000.

The check-kiting activity came to a halt in July 1988, when Dayton police officer Donald Vanzant stopped a driver who identified herself as Clair. He asked to see some identification, and she instructed him to get her purse out of an open briefcase that was in the car with her, and which she indicated belonged to her. As Vanzant removed the purse from the briefcase, he observed eleven checks made payable to different people, issued from a variety of banks. Clair then told Vanzant that another woman had taken Clair's briefcase from her, and Clair denied any knowledge of the checks. Her fingerprints were nonetheless found on one of the checks, as well as on a bank deposit envelope that was located with the checks. Vanzant seized the checks and placed Clair under arrest.

The jury found both defendants guilty on all counts except for three that had been dismissed by the court at the close of the government's case when an essential witness failed to appear. Carr was sentenced to 60 months' imprisonment on each of four pre-guidelines counts, to be served concurrently with each other and with the guidelines counts. He was sentenced to 60 months' imprisonment and three years' supervised release on all but one of the guidelines counts, also to be served concurrently with each other and with the pre-guidelines counts. On the remaining guideline count, he was sentenced to 30 months' imprisonment, to be served consecutively to the other terms, and to three years' supervised release. Thus, his aggregate sentence was 90 months' imprisonment and three years' supervised release. Clair's aggregate sentence on nine pre-guidelines and eight guidelines counts was 30 months' imprisonment and three years' supervised release.

Both defendants filed timely appeals.

## II.

### Challenges to the Convictions

#### A.

Both Carr and Clair argue that the government's theory of a single large conspiracy to defraud various banks was not borne out by the evidence, and that the theory allowed the government to impute to both defendants the activity of people with whom they had no contact. They argue that the evidence failed to show any connection among the various targets of the defendants' scheme. They suggest that it is significant that few of the accountholders had any relationship with each other, and that none of the accountholders benefitted from the other accountholders' activities.

■ If an indictment alleges one conspiracy, but the evidence can be construed as only supporting a finding of multiple conspiracies, a variance results. *United States v. Warner*, 690 F.2d 545, 548 (6th Cir.1982). However, even if a variance exists, it does not constitute reversible error "'unless it prejudice[s] [the defendant's] substantial

rights.'" *United States v. Guerra–Marez*, 928 F.2d 665, 671 (5th Cir.) (citation omitted) (*quoted in United States v. Lee*, 991 F.2d 343, 349 (6th Cir.1993)), *cert. denied,.* —— U.S. ——, 112 S.Ct. 322, 116 L.Ed.2d 263 and *cert. denied*, —— U.S. ——, 112 S.Ct. 443, 116 L.Ed.2d 461 (1991).

■ The essential elements of the crime of conspiracy are:

(1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.

*Lee*, 991 F.2d at 347–48 (citations omitted). It is not necessary to show that a defendant knew every member of the conspiracy or the full extent of the enterprise. *United States v. Shermetaro*, 625 F.2d 104, 108–09 (6th Cir.1980). It is not even necessary for a coconspirator to know about the acts of another coconspirator in order to be held responsible for those acts. *United States v. Davis*, 809 F.2d 1194, 1203 (6th Cir.), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740, and *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). Such evidence can be inferred from the interdependence of the enterprise. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir.1986), *aff'd*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

■ There was ample evidence to demonstrate that Carr and Clair conspired together. As Carr's attorney conceded at oral argument, the government demonstrated (1) a connection between the two defendants themselves; (2) a connection between one or both of the defendants and each of the various targets; and (3) the defendants' mutual interest in and benefit from the activity in all of the various accounts. On multiple occasions, they jointly initiated contacts with the accountholders. During the period of Carr's incarceration, in which he was incapable of

making these contacts, there was evidence of continuous and ongoing contact with Clair and with others involved in the scheme. It is, in short, simply unimportant that both conspirators were not shown to have committed every overt act. The essence of conspiracy is that the conspirators form an agreement, and then, independently as well as jointly, act in furtherance of that agreement. This argument on the part of the defendants is simply without merit.[1]

### B.

█ Clair contends that there was insufficient evidence to convict her with respect to two separate incidents. First, she argues that there was no evidence that would allow a conviction for aiding and abetting bank fraud with respect to transactions in the account of Carr's son, Eric Harris. She next argues that there was insufficient evidence to support her conviction for possession of the stolen mail that was found in her briefcase.

█ A party may raise an insufficiency of the evidence claim by two possible routes. One route is a motion for judgment of acquittal under Fed.R.Crim.P. 29, following the close of the government's case and again following the close of the evidence as a whole. *See United States v. Williams,* 940 F.2d 176, 180 (6th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991). The alternative route for raising this issue is a motion for new trial under Fed.R.Crim.P. 33.

Our thorough review of the record reveals that Clair neglected to make these insufficiency of the evidence arguments to the district court by either of the methods available to her. Because she has, therefore, failed to preserve these issues for appellate review, we will not reach the merits of her claim.

### C.

█ Clair's final attack on her conviction is that the district court erred to her preju-

dice when it denied her motion for a severance of counts and defendants under Fed. R.Crim.P. 14. She argues that the length and complexity of the trial overwhelmed the capacity of the jury. She points to the fact that several of the jurors had difficulty remaining awake, and that there were several jury requests for clarification of exhibits, and contends that these factors demonstrate the jurors' lack of attention to the trial.

█ Under Fed.R.Crim.P. 14,

[i]f it appears that a defendant … is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The decision on a Rule 14 motion is left to the court's discretion, and the denial of a severance " 'will not be disturbed on review unless the district court abused its discretion.' " *United States v. Swift,* 809 F.2d 320, 322 (6th Cir.1987) (citations omitted). To establish an abuse of discretion requires a showing of strong prejudice. *Id.* The movant must demonstrate the jury's inability to "separate and treat distinctively evidence relevant to each particular defendant." *Id.* Thus, even if some potential jury confusion is established, it " 'must be balanced against society's need for speedy and efficient trials.' " *Id.* (citations omitted).

It was not an abuse of discretion for the district court to deny Clair's motion for severance. It is true that the trial was long and complex, and that the jurors were evidently bored through at least part of the trial. But this problem seems endemic to the case itself, and did not stem from the failure to sever the counts and the defendants. There was only one conspiracy at issue in this case, and only two coconspirators. Separating the defendants would have required a repetition of virtually the same evidence in two sepa-

---

1. In addition to arguing that there was a variance between the indictment and the proof, both defendants argue, relying on *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that the district court erred in its jury instructions because the instructions implic-

itly assumed a single conspiracy, when in reality there were multiple conspiracies. Because it is clear that there was in fact only one conspiracy, it is not necessary to address this aspect of the defendants' argument.

rate proceedings, without any resulting benefits in terms of clarity. Because Clair has failed to demonstrate the prejudice necessary to show an abuse of discretion by the district court, we find her argument to be without merit.

### D.

■ Defendant Carr contends that the district court erred in failing to specifically instruct the jury regarding the inherently questionable credibility of those witnesses who had earlier pled guilty to related charges. The government points out, however, that the court instructed the jury generally regarding the weighing of witnesses' testimony, and cautioned them to consider "any relation that a witness may bear to either side of the case and his or her reasons for testifying...." It further instructed that "[t]he testimony of a witness may be discredited or impeached by showing that the witness has been convicted of a crime."

■ This court should review the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury. *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir.1991). A refusal to give requested instructions is reversible error only if three conditions are met: (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case. *Id.*

The court's instruction adequately informed the jury regarding the credibility of witness testimony, and so we are not troubled simply because the court chose not to explicitly highlight the credibility problems inhering in accomplice testimony. The instructions alerted the jury to the various considerations that it should take into account in weighing testimony, and it had an ample basis for rejecting the testimony of the accomplice witnesses if it had chosen to do so. In short, because the instructions given by the court substantially covered the same

material as the instruction requested by the defendant, there was no reversible error.

### E.

■ Carr next argues that the district court should have declared a mistrial when it became apparent that several jurors, and one in particular, were having trouble staying awake through the trial. The government argues that the incidence of sleep was minor when viewed in the context of the trial as a whole, and further, that the trial judge adequately addressed the issue by cautioning the jury as a whole to stay alert and by granting recesses.

We note that the district court called the problem of the sleeping jurors to the attention of the attorneys, yet Carr failed to request that any of the jurors be excused, and he did not ask for a mistrial.[2] We thus conclude that this issue has not been preserved for appellate review. *See United States v. Cardinal*, 782 F.2d 34, 36–37 (6th Cir.) (quoting *United States v. McDowell Contractors, Inc.*, 668 F.2d 256 (6th Cir. 1982)), *cert. denied*, 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986).

### F.

■ Carr points to a nonresponsive statement made during his trial counsel's cross-examination of a government witness, and contends that it is grounds for a mistrial. Specifically, the defense attorney questioned the investigating postal inspector regarding false names that had been used by certain of the accomplices in the conspiracy:

Q. Later on [the accomplices] recanted; in other words, they said, "No I misled you, I didn't tell the truth, these people don't exist." That's what they told you?

A. They told me that *and the fact that they had gotten that name from James Carr.*

(Emphasis added.) Upon objection by the attorney, the court struck the underlined portion of the witness's answer, ruling that it was nonresponsive to the question, and instructed the jury to disregard it. Based on

---

**2.** Clair, as well, failed to make these requests.

the witness's nonresponsive answer, defense counsel moved for a mistrial following the examination of the witness. The court denied the motion, and noted that the jury had been instructed to disregard the comment. And, as the government points out, the information that Carr now argues is grounds for a mistrial was identically produced during redirect examination of the same witness, and counsel for Carr failed to object.

If evidence is erroneously admitted, the subsequent striking of the evidence along with clear instructions to the jury to disregard it, ordinarily will cure the error. *United States v. Wells*, 431 F.2d 432, 433 (6th Cir.), *cert. denied*, 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed.2d 388 (1970). Only if the erroneously admitted evidence is of an exceptionally prejudicial character, such that its withdrawal from consideration by the jury cannot be expected to remove the harm, will it be appropriate to grant a new trial. *Id.* In this instance, striking that part of the witness's statement to which defense counsel objected was more than sufficient to cure any error.

### G.

Carr's final attack on the validity of his conviction is that he was denied effective assistance of counsel. Generally, "a defendant may not raise a claim of ineffective assistance of counsel for the first time on direct appeal, since such a situation generally precludes an opportunity to develop and include evidence bearing on the merits of the allegations of ineffective assistance in the record." *United States v. Smith*, 981 F.2d 887, 894 (6th Cir.1992). There is no reason in this case to depart from our usual rule. The preferable route for raising an ineffective assistance of counsel claim is in a postconviction proceeding under 28 U.S.C. § 2255, which allows the parties to develop an adequate record on the issue. *See, e.g., United States v. Frazier*, 936 F.2d 262, 267 (6th Cir.1991).

### III.

#### Challenges to the Sentence

In considering challenges to a sentence imposed pursuant to the sentencing guidelines, this court applies a clearly erroneous standard of review to the district court's factual findings. *United States v. Garner*, 940 F.2d 172, 174 (6th Cir.1991). And, while giving due deference to the district court's application of the guidelines to those facts, this court renders *de novo* review of the district court's legal conclusions. *Id.*

### A.

The district court increased Carr's offense level by two levels for more than minimal planning, under U.S.S.G. § 2F1.1(b)(2), and by an additional four levels for his role as an organizer or leader, under U.S.S.G. § 3B1.1(a). The defendant argues that this constituted "double counting," and is a basis for vacating the sentence. The government concedes that in *United States v. Romano*, 970 F.2d 164 (6th Cir. 1992), this court held that to impose both of these enhancements on a single defendant constitutes improper "double counting," because "by its very nature, being an organizer or leader of more than five persons necessitates more than minimal planning." *Id.* at 167. The government argues, however, that because section 2F1.1(b)(2) provides an alternative basis for the enhancement in the event of "a scheme to defraud more than one victim," this court should itself take note that more than one victim was involved in this conspiracy, and should affirm the district court's ruling on that basis. The district court, however, did not, either implicitly or explicitly, rely on the alternative basis suggested by the government for its two-level enhancement under section 2F1.1(b)(2). Thus, the government's argument asks us to make a factual finding that is appropriately made only in the first instance by the district court. This we decline to do.

Because the district court quite plainly violated the dictate of *Romano*, on remand, the court should redetermine Carr's base offense level.

### B.

Carr next objects to the district court's imposition of an upward departure. The district court imposed an aggregate sen-

tence of 90 months' imprisonment on Carr, rather than the applicable range of 57–71 months, based upon Carr's extensive criminal history and the chance of recidivism. The court thought that Carr's criminal history score of VI inadequately reflected his actual history, because Carr had 20 criminal history points while only 13 are required to receive the maximum score of VI. The court also characterized the likelihood of recidivism as "approach[ing], if it does not equal, 100 percent." Accordingly, the court engaged in a complicated computation, in which it calculated that if there were additional criminal history scores beyond VI, Carr would, based on his points, have a score of IX. The hypothetical score of IX would combine with his offense level of 18 for a range of from 78 to 92 months. The court chose to sentence him to the upper end of the range, imposing a term of 90 months.

This court has, in the past, accepted the district court's methodology for calculating an upward departure under the same circumstances. *See, e.g., United States v. Osborne,* 948 F.2d 210, 213 (6th Cir.1991). We note, however, that the guidelines, as amended in November 1992, disapprove of this method:

> Where the court determines that the extent and nature of the defendant's criminal history, taken together, are sufficient to warrant an upward departure from Criminal History Category VI, *the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level* in Criminal History Category VI until it finds a guideline range appropriate to the case.

U.S.S.G. § 4A1.3, p.s. (emphasis added). Thus, instead of hypothesizing a criminal history range more than VI, the guidelines require a sentencing court to look to the other

axis and consider the available ranges from higher offense levels.

We note that Carr's offense level would have to be increased from 18 to 21 in order to result in a range in which he could have received the sentence of 90 months. On remand, the district court should apply the methodology suggested by the guidelines, and if it elects to treat Carr as if his offense level were 21, it must demonstrate why it found the sentence imposed by each intervening level to be too lenient. *United States v. Lassiter,* 929 F.2d 267, 270 (6th Cir.1991).[3]

## C.

In calculating the base offense level, the court determined the amount of loss under section 2F1.1 to fall within the range of $100,000.01 to $200,000. In reaching this figure, the court accepted

> the Government's theory that the amount of loss … should be computed by adding the amount of the stolen checks deposited into the accounts used in the scheme ($143,891.98), the amount of the stolen checks deposited into the Veronica Gates account ($19,390.77), the amount of the stolen checks deposited into the Carmen Clair account ($5,700.56) and the amount of the stolen checks constructively possessed by the Defendant Carmen Clair ($7,945.51), for a total intended loss of $176,928.82.

The court therefore increased the base offense level by six levels.

Carr protests the district court's failure to make a determination that the amount of deposits in the fraudulent accounts were reasonably foreseeable to him. He also argues that the court erred in using the intended amount of loss rather than the actual loss.[4]

---

**3.** We do not reach the questions whether the circumstances for departure enunciated by the district court are sufficiently "unusual," or whether the circumstances actually existed in this particular case. *See United States v. Brewer,* 899 F.2d 503, 506 (6th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

**4.** Carr also argues that the method employed by the district court was erroneous because the court should not have considered the entire amount of loss involved in the conspiracy, but

instead should have determined the amount of loss within the scope of Carr's agreement personally. This part of the defendant's argument is entirely lacking in merit: he may properly be held accountable for the entire amount of loss occasioned by the conspiracy because there was ample evidence that he either personally caused the various losses or that the losses were reasonably foreseeable to him. *See* U.S.S.G. § 1B1.3(a)(1).

■ This court recently decided *United States v. Watkins,* 994 F.2d 1192 (6th Cir. 1993), in which it considered the precise question presented here: the proper method for calculating the amount of loss in a check-kiting scheme. The court found that

three factors must be present for an amount of loss to be relevant under section 2F1.1. First, ... the defendant must have intended the loss. Second, it must have been possible for the defendant to cause the loss. Third, the defendant must have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss.

*Id.* at 1196. The court vacated the sentence and remanded for resentencing because "the extent to which [the defendant] was capable of causing the full amount of the loss is ... at issue, since realistically the record suggests that [the defendant] could not have withdrawn the full amount of every check that she deposited." *Id.* The *Watkins* court lamented the inadequacy of the sentencing court's findings, because the sentencing "report contain[ed] very little if any evidence that [the defendant] intended to, or could have, completely drained her accounts of the funds purportedly contained therein." *Id.*

On remand, the sentencing court should consider the requirements of *Watkins* regarding necessary findings both as to intended and actual loss under U.S.S.G. § 2F1.1.

### D.

■ Finally, Carr objects to the district court's treatment of his objections to the presentence report. The court concluded that the objections

are merely an attempt to retry the case already decided adversely to the Defendants by the jury[. T]he Court, having presided over the jury trial and having considered the testimony adduced therein in preparation for sentencing, will place the designation "overruled; attempt to retry jury trial" next to the designation of the objection.

The court specifically responded to the "objection to a 4 point enhancement for the Defendant as an organizer or leader of a criminal activity that involved 5 or more participants or was otherwise extensive[,]" as follows:

Overruled; the evidence adduced at trial proves beyond any and all reasonable doubt the Defendant's entitlement to such an enhancement. The Defendant's objection is an attempt to retry the jury trial.

Carr argues that the district court was required to make an explicit finding that he had control over four other persons in the offense, and more generally, that the type of conclusion made by the district court in response to all his objections was too cursory, and fails to comply with the mandate of Fed.R.Crim.P. 32(c)(3)(D). We note that Rule 32(c)(3)(D) provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

In resentencing the defendant, the district court should make a finding of fact with respect to any objection the defendant makes to the presentence report, and identify the basis for such finding.

### IV.

We **AFFIRM** the judgments of conviction of both Carr and Clair. We **VACATE** Carr's sentence and **REMAND** for resentencing.