**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Moussa DIOMANDE, Defendant–
Appellant.**

No. 01–1353.

United States Court of Appeals,
Sixth Circuit.

July 1, 2002.

Before RYAN, BOGGS, and COLE, Circuit Judges.

RYAN, Circuit Judge.

Moussa Diomande appeals from his conviction entered pursuant to 18 U.S.C. § 371 for conspiring to defraud the United States Immigration and Naturalization Service (INS). On appeal, Diomande argues that the district court abused its discretion when it refused to declare a mistrial after striking a government witness's testimony. He also argues that the district court infringed upon his Sixth Amendment rights when he was denied the opportunity to testify about the West African cultural tradition of providing assistance to fellow countrymen living in the United States. Neither of Diomande's arguments has merit, and we affirm the judgment of the district court.

**I.**

Diomande was convicted in an October 2000 jury trial for his part in a conspiracy

to defraud the INS. The scheme, based in Flint, Michigan, paid U.S. women to marry men emigrating to the U.S. from the Ivory Coast, allowing the men to gain resident status or citizenship. It was alleged that Diomande's role in the conspiracy was to drive couples to Ohio, where there is no waiting period to obtain a marriage license, to help couples complete and submit paperwork to the INS, and to pay some of the women for their participation. Upon conviction, Diomande was sentenced to 18 months' imprisonment.

The government presented the testimony of Federal Bureau of Investigation Special Agent John Cecil, who, with an INS Agent, had interviewed Diomande in the course of an investigation into the sham marriage scheme. Cecil testified that Diomande had claimed during the interview that he had never driven any couples to Ohio to marry, that he had never assisted anyone in the preparation of documents submitted to the INS, and that he knew nothing about the marriage scheme. On cross-examination, however, Cecil revealed that he had not actually been present when Diomande was asked about the marriage scheme and that he had no personal knowledge about the abovementioned denials. The district court judge then intervened:

> THE COURT: Wait a minute. Let me ask you a question. Wait a second. Did you personally hear Mr. Diomande say that he never drove anyone to Ohio?
>
> THE WITNESS [(Cecil)]: Personally, no.
>
> [DEFENSE COUNSEL]: Judge, I have a second motion and I ask the jury -
>
> THE COURT: No. Did you personally hear him say he knew nothing about marriage fraud?
>
> THE WITNESS: No, I did not.

> THE COURT: Did you personally hear him say he knew nothing about filling out forms?
>
> THE WITNESS: No, I did not.
>
> THE COURT: The jury will disregard the witness's testimony in those respects.

The judge then excused the jury in order to address further Cecil's testimony. Although the Assistant U.S. Attorney claimed that she was told that Cecil was present when Diomande was asked about the conspiracy, she admitted that she had not interviewed the agent prior to his testimony. The defense then moved for a mistrial, prompting the trial judge to respond: "I understand you're going to make a motion for a mistrial and I am not going to grant a mistrial because I am going to show ask [sic] you if there is a less restrictive means of dealing with all of the objections you have had. There will be no mistrial declared in this case, period, at this time. At this time." The judge then summoned the jurors and said to them: "I have excused Mr. Cecil as a witness and you will disregard all of his testimony. Put it out of your mind. Forget it."

Later in the trial, Diomande took the stand in his own defense. On re-direct conducted by his attorney, the following exchange occurred:

> Q [DEFENSE ATTORNEY:] Some of the questions you were asked by [the AUSA] were questions—first of all, you gave rides to Ohio to three different couples, guy come [sic] over in the morning say [sic] I want to get married, you take him.
>
> Remember those questions?
>
> A[:] Yes.
>
> Q[:] Is that type of help the type of help that West Africans give each other?
>
> [AUSA]: Judge, this is—

THE COURT: I'm going to sustain the objection.

[DEFENSE COUNSEL]: May I make a separate record on that?

THE COURT: No. You just go ahead.

[DEFENSE COUNSEL]: I've no further questions.

The defense then rested, and the jury later returned a verdict finding Diomande guilty.

## II.

On appeal, Diomande presents two distinct arguments based on the trial court's conduct of the trial. Upon review we find that neither argument has merit, and we dispose of each in turn.

First, Diomande argues that the district court abused its discretion when it denied Diomande's motion for a mistrial after striking Cecil's testimony. He contends that the case against him was a "close one," and because the stricken testimony concerned a purported statement from the defendant, Cecil's assertions were so prejudicial that the jury could not have been trusted to disregard them upon the judge's instructions. The government counters that the testimony was offered in good faith and that it was not until cross-examination that the parties learned that Cecil was not present throughout the interview. Furthermore, the government contends that the agent had earlier informed counsel that he had participated in the entire interview.

We review a district court's refusal to grant a mistrial for abuse of discretion. *United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir.1994). A district court has committed an abuse of discretion only "when the reviewing court is firmly convinced that a mistake has been made." *Id.*

Upon review of a mistrial motion, fairness to the accused is our primary con-cern. *United States v. Forrest,* 17 F.3d 916, 919 (6th Cir.1994) (*per curiam*). We have held that when evidence is admitted in error, striking the testimony and providing clear limiting instructions to the jury usually cures the error. *United States v. Carr,* 5 F.3d 986, 993 (6th Cir. 1993). It is presumed that juries follow a trial judge's admonition to disregard an improperly introduced statement. *Forrest,* 17 F.3d at 920–21. "Only if the erroneously admitted evidence is of an exceptionally prejudicial character, such that its withdrawal from consideration by the jury cannot be expected to remove the harm, will it be appropriate to grant a new trial." *Carr,* 5 F.3d at 993.

■ Upon review, we find that the district court did not abuse its discretion in denying the mistrial motion. Cecil's stricken testimony was not especially prejudicial, and even if the testimony did prejudice Diomande, the district court's unequivocal and repeated instructions to disregard all of Cecil's testimony were sufficient to cure any bias that could have affected the jury's deliberations. Cecil testified that during the interview, Diomande denied any involvement in activities that were later determined to constitute the conspiracy to defraud. In his testimony, Diomande admitted driving couples to Ohio to marry and helping them prepare INS paperwork. He claimed that his assistance was not part of any agreement to conspire, but was only aid to fellow West African immigrants. It is true that Cecil's testimony regarding the earlier denials tended to cast Diomande's trial assertions in a questionable light, but when coupled with the district court's instructions, it was not so damning as to require a mistrial. Ten witnesses testified to Diomande's active role in the conspiracy, and Cecil's short testimony was a small part of the proofs. Further-

more, Cecil's testimony was as damaging to the government as it was to Diomande. The trial judge himself questioned Cecil and determined that his testimony should be stricken, thereby highlighting the government's failure to fully vet its witness. Here, Diomande suffered no harm and the trial court did not abuse its discretion by refusing to grant a mistrial.

■ Diomande's second basis for appeal rests on his argument that he should have been allowed to testify regarding the types of assistance West Africans living in the United States provide to one another. Part of his defense theory was that the actions he took were in fulfillment of his cultural obligation to assist fellow countrymen and that he lacked the specific intent to conspire. He contends that the district judge's refusal to permit him to testify regarding this tradition violated his Sixth Amendment right to introduce evidence influencing the determination of guilt.

"We review the district court's evidentiary rulings, involving an alleged violation of Sixth Amendment rights, under a *de novo* standard of review." *United States v. Hamilton*, 128 F.3d 996, 999 (6th Cir. 1997) (citing *United States v. Lloyd*, 10 F.3d 1197, 1216 (6th Cir.1993)). Pursuant to that standard, we find that the district court committed no error.

The Sixth Amendment's Compulsory Process Clause "provides a defendant with the right to present witnesses and evidence in his defense." *Hamilton*, 128 F.3d at 1000 (citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). The Sixth Amendment also provides one of the bases for a criminal defendant's fundamental right to testify on his behalf. *Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restric-

tions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). The right to testify on one's own behalf may be limited "to accommodate other legitimate interests in the criminal trial process" that are not "arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 55–56 (internal quotation marks and citation omitted); *see Neuman v. Rivers*, 125 F.3d 315, 318 (6th Cir.1997). The exclusion of evidence is unconstitutionally arbitrary or disproportionate only when it infringes upon a "weighty interest of the accused." *Scheffer*, 523 U.S. at 308. Therefore, "[f]or denial of a defendant's proffered testimony to constitute reversible error, the testimony must establish a reasonable doubt about guilt in light of the record in the case." *United States v. Reifsteck*, 841 F.2d 701, 705 (6th Cir.1988).

Testimony concerning Diomande's cultural tradition was sought through a number of defense counsel questions. For example, during Diomande's re-direct counsel posed questions concerning a West African social club established in Flint that the government had inquired into on cross-examination. When Diomande's counsel reopened that line of inquiry on re-direct, the following exchange occurred:

[AUSA]: Judge, I'll object. What's the relevance to this?

[DEFENSE COUNSEL]: Judge, this was something that was brought out on cross examination and I'm trying to explain the purpose and situation as far as this—that he raised money with Mr. Camara.

THE COURT: Well, briefly.

Proceeding past the social club questions, Diomande's counsel continued:

[DEFENSE COUNSEL]: Now was there something that was carried over

from West Africa in terms of how people helped reach other [sic] or didn't help each other?

That may be different from what you see with Americans.

[AUSA]: Judge, again, I don't know where this question is going.

THE COURT: I don't know where it's going either, but we're—I'll let him answer.

I have a hunch I know the answer, so I'll let him answer yes or no.

Diomande answered that Africans have a tradition of communal sharing. Diomande was then questioned regarding his agreement to drive couples to Ohio and was asked, "Is that . . . the type of help that West Africans give each other?" At that point, the district court sustained the government's objection. Diomande's attorney was denied the opportunity to make a separate record at that time on the evidence he hoped to elicit, but he was given an opportunity to do so later in the trial.

Upon review of this exchange and the applicable law, we conclude that Diomande's argument is baseless. He argues that the district court's exclusion of the testimony denied him his Sixth Amendment right to testify fully on his behalf. As stated, however, the right of a defendant to present evidence, including his own testimony, is subject to reasonable restrictions, and the trial court's decision to sustain the government objection was reasonable. The exclusion of the cultural tradition testimony did not infringe upon any weighty interest held by Diomande. Admission of the testimony defense counsel sought would not cast the conviction in reasonable doubt and its exclusion is not reversible error. In fact, as proven by the cited colloquies, Diomande did present testimony regarding West African cultural traditions, but it was not as much as he would have liked. As the government con-

tends, and the defense does not deny, 10 witnesses testified to Diomande's knowing membership in the conspiracy, including two women who testified that Diomande paid them for their participation. The cultural history line of questioning was not directly relevant to the conspiracy, and the district court's ruling did not deny Diomande the ability to present his defense.

## III.

For the reasons set forth above, we **AFFIRM** the judgment of the district court.