**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James M. BURRESS, Defendant–
Appellant.**

**No. 03–6223.**

United States Court of Appeals,
Sixth Circuit.

July 29, 2004.

Candace G. Hill, Asst. U.S. Attorney, Terry M. Cushing, Asst. U.S. Attorney, Monica Wheatley, Asst. U.S. Attorney, U.S. Attorney's Office, Louisville, KY, David G. Sparks, United States Attorney's Office, Paducah, KY, for Plaintiff–Appellee.

Samuel Manly, Louisville, KY, for Defendant–Appellant.

Before KEITH, CLAY, and GIBBONS, Circuit Judges.

CLAY, Circuit Judge.

Defendant James M. Burress appeals his conviction for possessing approximately $78,780.00 of money stolen from an FDIC-insured bank, in violation of 18 U.S.C. § 2113(c). For the reasons that follow, we AFFIRM his conviction.

## I.

On February 5, 2003, a federal grand jury sitting in the United States District Court for the Western District of Kentucky issued a two-count indictment against Travis Boothby ("Boothby") and his housemate, Defendant James Burress ("Burress"). Count 1 charged that, on January 16 and 17, 2003, Boothby; an employee of the FDIC-insured Union Planter's Bank in Paducah, Kentucky, carried away with the intent to steal and purloin approximately $78,780.00 belonging to the bank, in violation of 18 U.S.C. § 2113(b). Count 2 charged that on the same dates, Burress "did receive possess, conceal, store, and dispose of approximately $78,780.00 of money, which had been taken and stolen" from the bank, in violation of 18 U.S.C. § 2113(c).

The events underpinning the indictment transpired as follows: On January 16, 2003, the branch of Union Planters Bank located on Clarks River Road in Paducah, Kentucky closed early due to a heavy snowfall. Boothby was in the bank on that day because he was primarily responsible for training tellers to use the two cash dispensing machines.[1] After the bank closed, Boothby removed approximately $78,000.00 from these machines.[2] Boothby never told Burress, his long-time friend

and housemate, that he had planned on taking the money.

After leaving the bank, Boothby went back to his hotel and then to a casino to gamble with some of his personal money. He broke even. Upon leaving the casino, Boothby called Burress and told him where he had been. Burress was upset that Boothby had been gambling, but Boothby told him not to worry because he had "a surprise for him and ... would be home later" that night. After eating dinner at the hotel and watching some television, Boothby started his drive back to Bowling Green at about 9:00 p.m.

When Boothby arrived home after midnight, he entered the house carrying a blue bag covered by his navy blue pea coat. His arrival awoke Burress, who had been dozing in a recliner in front of the television. Burress rose from the recliner after Boothby told him he had a surprise for him. Boothby opened the bag he was carrying, which was filled with the stolen bank money. Burress' mouth dropped open and a look of awe appeared on his face as he caught sight of the money. Boothby then said, "Look what I won and don't worry about it."

Accompanied by Burress, Boothby took the bag of money to the bedroom and started to count it. He and Burress talked about what they might be able to buy with the money, and Boothby gave Burress about $500 of the cash. There was no discussion about the money having been obtained unlawfully.

Because the hour was late and Boothby had to return to Paducah for work the next morning, the two stopped counting the money. They put the money back into

---

[1]. Boothby lived in Bowling Green, but would stay in a hotel in Paducah for the few days a week he would train employees on the machines.

[2]. Boothby claims he took the money because he knew that his position with the bank was going to be eliminated and he was concerned about potential financial problems.

the bag, walked to the garage, and stuffed the bag in the attic, underneath some blown insulation. Boothby then drove back to Paducah. He called Burress at 3:45 a.m. to say he had arrived.

Later in the morning of January 17, Burress ran some errands, which included purchasing a money order with some of the cash Boothby had given him. He intended to use the money to pay some bills. At around 9:00 a.m., Burress called Boothby at work, but Boothby said he was too busy to speak at that time.

Burress went into work at 1:15 p.m, but about an hour later, he told his workplace that he needed to go home because he was concerned that he had left his gas logs burning. He called Bootbhy at around 3:15 p.m. to tell him he was leaving work to go home to turn off the gas logs. During that conversation, Bootbhy, "out of the blue," told Burress, "The FBI is here. Just do something with the money." According to Burress, "[l]ots of things" entered his mind at that point, including the thought that Boothby might have taken the money from work.

Upon arriving home, Burress went to the attic, retrieved the money, and came back downstairs into the garage. Suddenly, the doorbell rang. Burress assumed that an FBI agent was at the front door because Bootbhy had told him that the FBI might be coming to talk to him. He dropped the bag of money in a box and went to answer the door. Burress greeted FBI Special Agent Richard Glenn ("Agent Glenn") at the door, and Agent Glenn told Burress that he was investigating the theft of approximately $80,000.00 from the Union Planters Bank.

Agent Glenn and Burress talked for a while. According to Burress, Agent Glenn never asked him if he had the stolen money, and Burress did not volunteer that he had it. Agent Glenn testified differently, stating that, at the beginning of his conversation with Burress, he had asked Burress whether Boothby had anything in his hands or any large amount of money when he arrived home at midnight on January 16, 2003, and Burress denied that he had.[3] Agent Glenn then asked to search the house, and Burress consented. Agent Glenn searched a closet and then the garage, where he discovered the bag full of money. After Agent Glenn announced, "I wonder what this is doing here," Burress reacted with a look of feigned shock.

Agent Glenn and Burress then proceeded back to the living room for an interview. Agent Glenn testified, "Mr. Burress told me that he hadn't been truthful with me when I had first gotten there and taken me where the money was because he was hoping that I wouldn't find it...." According to Burress, he had wanted the opportunity to tell Boothby to take the money back so that "everything would be okay."

Burress next told Agent Glenn how he had come into possession of the money. He stated that when Boothby arrived home late on January 16, he showed Burress the money, said it was for him, and said "Don't ask where it came from." According to Agent Glenn, Burress added that when he first saw the money, "he

---

3. Burress claims that, when he initially spoke to Agent Glenn, he did not deny seeing Boothby with the money at any time during the night of January 16, 2003. Rather, he claims that Agent Glenn had asked him only whether he had seen anything out of the ordinary at the moment Boothby arrived home, Burress asserts that he answered Agent Glenn's question truthfully because he did not see anything out of the ordinary at the very moment of Boothby's arrival, only minutes later when Boothby opened the money-filled bag. He states that Agent Glenn failed to follow up on Burress' "truthful" response by asking whether he saw anything out of the ordinary at any time after Boothby's arrival.

knew it wasn't gambling money. He felt certain that it was stolen money." Burress also told Agent Glenn that the denominations of the bills—2,200 twenties and several hundred $100 bills—just did not make sense to him as gambling winnings. Burress then said that when he woke up on the morning of January 17, 2003, he decided that he was going to tell Boothby to return the money. Later that day, when Boothby instructed him to do something with the money. Burress "realized that this was bad stuff and that things had gone too far."

Boothby pleaded guilty to the indictment before trial. Burress went to trial, and a jury found him guilty on April 30, 2003. On May 9, 2003, Burress moved for a new trial pursuant to Federal Rule of Criminal Procedure 33(a) on the ground that the jury instructions were erroneous and that the court should have used his proposed jury instructions. He also moved for a judgment of acquittal pursuant to Rule 29(c). The court denied the motion for a new trial, and implicitly denied the motion for acquittal, because on August 29, 2003, the court sentenced Burress to a term of imprisonment of twelve months and one day. The court entered judgment was entered on September 4, 2003, and this appeal followed.

## II.

### Propriety of the District Court's Jury Instructions

■ The Court in *United States v. Prince*, 214 F.3d 740, 760–61 (6th Cir. 2000), described the standard of review for a challenge to jury instructions as follows:

This court reviews jury instructions as a whole to determine whether they fairly and adequately inform the jury of relevant considerations and explain the applicable law to assist the jury in reaching its decision. *United States v. Layne*, 192 F.3d 556, 574 (6th Cir.1999)

(citations omitted); *United States v. Harrod*, 168 F.3d 887, 890 (6th Cir.1999) (citations omitted). Trial courts have broad discretion in drafting jury instructions, and we reverse only for abuse of discretion. *United States v. Moore*, 129 F.3d 873, 876–77 (6th Cir.1997) (citing *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir.1988)). We will not reverse the trial court unless the jury charge " 'fails accurately to reflect the law.' " *Layne*, 192 F.3d at 574 (quoting *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir.1988)). We may reverse a judgment based on an improper jury instruction " 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.' " *Harrod*, 168 F.3d at 892 (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir. 1990)). No single provision of the instructions can be reviewed in isolation; we must consider the charge as a whole. *United States v. Lee*, 991 F.2d 343, 350 (6th Cir.1993) (quoting *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988)).

For the reasons below, we hold that Burress is not entitled to a new trial because the jury instructions were not confusing, misleading or prejudicial.

Burress was charged with violating 18 U.S.C. § 2113(c). Section 2113 provides in relevant part:

(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than ten years, or both; or

Whoever takes and carries away, with intent to steal or purloin, any property

or money or any other thing of value not exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than one year, or both.

(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value which has been taken or stolen from a bank, credit union, or savings and loan association in violation of subsection (b), knowing the same to be property which has been stolen shall be subject to the punishment provided in subsection (b) for the taker.

After all the evidence was presented at Burress' trial, the court conferred with counsel concerning the jury instructions. The court's instructions stated:

Title 18, United States Code, Section 2113(c) makes it a crime for anyone to receive, possess, conceal, store, or dispose of any property or money or any other thing of value which has been taken or stolen from a federally-insured bank exceeding $1,000, knowing that the money had been stolen. The indictment in this case states that about January 16, 2003, and January 17, 2003, the defendant, James M. Burress, did receive, possess, conceal, store, and dispose of approximately $78,780. [sic][o]f money, which had been taken and stolen from Union Planters Bank, whose deposits were then insured by the Federal Deposit Insurance Corporation, knowing such money to be property which had been stolen.

For you to find the defendant, James M. Burress, guilty of this crime, you must be convinced that the government proved each of the following beyond a reasonable doubt:

FIRST: That the Union Planters Bank had its deposits insured by the Federal Deposit Insurance Corporation.

SECOND: The money stolen from the Union Planters Bank was on [sic] excess of $1,000.00.

In this case the parties have stipulated that the Union Planters Bank had its deposits insured by the Federal Deposit Insurance Company [sic] on January 16 and 17, 2003. The parties have also stipulated that the money at issue was stolen from the Union Planters Bank on January 16, 2003. There is no need for you to consider these first two elements.

THIRD: That the defendant, James M. Burress, received, possessed, concealed, stored, or disposed of the stolen money; and

FOURTH: That the defendant, James M. Burress, at some time during his possession of the money, knew that the money had been stolen.

The government does not have to prove that the defendant participated in the bank theft or that the defendant knew the identity of those who committed the theft. Nor does the government have to prove that the defendant knew that the money was stolen from a bank.

Unless otherwise separately defined, all words used in these instructions are to be given their common and ordinary meaning.

Burress' theory of the case was that he did not know the money had been stolen when he initially received or possessed it the night before. He gained such knowledge only when Agent Glenn appeared at his door, and in no event did he suspect the money had been stolen earlier than the hour before Agent Glenn's arrival, when he spoke with Boothby on the phone, learned that the FBI was investigating, and was instructed to do something with the mon-

ey. Given the brevity of time between Burress' knowledge of the money's stolen nature and his involuntary relinquishment of the cash to the FBI, Burress maintains that he had little or no opportunity to voluntarily return possession of the money and avoid criminal liability; he notes that during his conversation with Agent Glenn, he had a Fifth Amendment right not to volunteer the location of the money, thereby avoiding potentially incriminating himself. The fact that the jury could find him guilty under these circumstances, argues Burress, is fundamentally unfair. He asserted that, to be fair, the instructions should have included the additional factor that, once Burress learned the money was stolen, he continued to exercise dominion or control over it by retaining it or converting it to his own uses.

Burress renews his argument on appeal. He claims that the court's instruction told the jury that it could convict Burress even if his possession of the money preceded his knowledge that it was stolen and even if Burress never retained or otherwise converted the money after he learned it was stolen. We disagree. The relevant portion of the instruction—the fourth element—required the jury to find that Burress, "at some time during his possession of the money, knew that the money had been stolen." In other words, there had to be a point in time when Burress *both* possessed the money *and simultaneously* knew that the money had been stolen. Thus, unless the jury ignored the plain language of the instruction, it could not have convicted Burress of possessing the money at a time when he did not know it had been stolen. We also disagree that the jury was permitted to convict Burress after he learned of its stolen nature, even though he did not "retain" the money. 'Retain' is virtually synonymous with 'possess.' *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1938 (1993) (defining retain to mean "to hold or continue to hold in pos-

session or use"). As such, the jury could not have convicted Burress without finding that he knew the money had been stolen at the time he retained that money.

We also note that this Court rejected Burress' argument in *United States v. Scruggs*, 549 F.2d 1097 (6th Cir.1977). Like Burress, the Scruggses contended that the court did not properly instruct the jury on the *mens rea*, or knowledge, element of 18 U.S.C. § 2113(c), and that they did not know the money they had received was stolen from a bank at the time they received it. *Scruggs*, 549 F.2d. at 1105. The Court held that the district court "correctly instructed the jury that a violation of § 2113(c) was established if at any time during their possession of the money the Scruggses came into knowledge of its stolen character." *Id.* at 1106. Because the jury at Burress' trial was instructed in the identical manner, we likewise reject his attempt to overturn his guilty verdict.

██ We agree with Burress insofar as the instructions did not permit the jury to acquit him even though he did not convert the money after he first allegedly learned that it had been stolen. This fact does not entitle him to a new trial, however, because conversion is not an element of a violation of 18 U.S.C. § 2113(c). As stated in *Scruggs*,

[t]he essential elements of a § 2113(c) offense are these: 1) proof that property or money or other things of value were taken from a federally insured bank; 2) proof that the defendants possessed, concealed or disposed of said property or money; and 3) proof that the defendants had knowledge of the stolen character of the property or money at the time they possessed, concealed or disposed of it.

549 F.2d at 1103. Neither the statute, nor the Court in *Scruggs*, listed conversion as a separate element of the offense. Thus, a

ruling in Burress' favor would run afoul of our earlier holding in *Scruggs*.

As Burress correctly points out, the operative prohibitions of 18 U.S.C. § 2113(c) are written in the disjunctive, which means that it is unlawful to receive *or* possess *or* conceal, *or* store, *or* dispose of any property stolen money. *See Scruggs*, 549 F.2d at 1105 (holding that "that the offense of possession of stolen goods is distinct from the offense of receiving stolen goods" because the "statute defines these offenses in the disjunctive and, therefore, clearly reflects the congressional intent that there were to be distinct crimes"). Burress notes that the *actus reus* element of the jury instructions (the third element) appropriately required the jury to find that he "received, possessed, concealed, stored, or disposed of the stolen money." He objects to the fact that the instructions as to the *mens rea or* knowledge, requirement (the fourth element) referred only to the possession of stolen money and not also to the receipt, concealment, storage or disposal of stolen money. *See* J.A. 41 (instruction defining the fourth element of the crime to be that Burress, "at some time during his possession of the money, knew that the money had been stolen"). According to Burress, the alleged failure to extend the knowledge requirement to receiving, concealing, storing or disposing of the stolen money made it possible for the jury to find him guilty, without a finding that he *knowingly* received, concealed, stored or disposed of the money.

We reject this argument as well. In order for the jury to have convicted Burress, it needed to find, pursuant to the court's instruction on the fourth element, that Burress knew that the money had been stolen "at some time during his pos-

session of the money." Such a finding has two components: first, that Burress knew the money had been stolen and, second, that Burress possessed the money at that time. These two findings, which the jury made, were sufficient to support his conviction. Moreover, because the fourth element of the instructions omitted any mention of receiving, concealing, storing, or disposing the money, the instructions narrowed the circumstances under which Burress could be convicted under the statute. Under the instructions, he could be found guilty *only* if he possessed the money with knowledge of its stolen nature.[4] Thus, the only party prejudiced by these erroneous instructions was the government, not Burress. Burress is not entitled to a new trial.

## III.

### Propriety of the District Court's Refusal to Give Alternative Jury Instructions

This Court will reverse a conviction for failure to give a requested jury instruction only when:

(1) the requested instruction is a correct statement of the law;

(2) the requested instruction is not substantially covered by other delivered instructions; and

(3) the failure to give the instruction impairs the defendant's theory of the case.

*United States v. Chesney*, 86 F.3d 564, 573 (6th Cir.1996) (citing *United States v. Carr*, 5 F.3d 986, 992 (6th Cir.1993)). For the reasons that follow, we hold that the district court properly rejected Burress' proposed jury instructions.

---

4. The fact that the court followed its instruction as to the fourth element by a lengthy definition of possession, but no definition of the other terms, likely focused the jury even

more on the need to find that Burress possessed the money at a time when he knew it had been stolen.

According to Burress, the court's instruction "told the jury absolutely nothing about what Burress must have known, if anything, in order for the jury to find him guilty under any one or more of the alternative prosecution theories of receiving, concealing, storing or disposing of the money." As discussed in the preceding section, however, this omission favored Burress. If the jury followed the letter of the court's instructions, as we must presume, *United States v. Tines,* 70 F.3d 891, 898 (6th Cir.1995), it could not have convicted Burress solely for receiving, concealing, storing or disposing of the money. Rather, element four of the instruction required the jury to find that he had possessed the stolen money and, at the time of possession, knew the money was stolen. Without a finding of possession (and knowledge while possessing), Burress could not have been convicted. The instructions effectively wrote the alternative bases of guilt out of the case.

Burress further argues that the court erred when it rejected his proposed jury instructions because it impaired his theory of the case. Burress claims that the government was required to prove that Burress took some voluntary act in derogation of the rights of Union Planters Bank upon or after he learned that the money was stolen, such as retaining it or otherwise converting it to his own use or to the use of another. As discussed in the preceding section, neither 18 U.S.C. § 2113(c), nor the Court in *Scruggs,* listed conversion as a separate element of the offense. Thus, there was no basis for the court to have imported this element into the instruction. Although the district court's rejection of Burress' proposed instruction may have impaired his theory of the case, the court would have erred by permitting it because it did not contain a correct statement of the law.

## IV.

For all the foregoing reasons, the conviction of Defendant James Burress is AFFIRMED.