**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0327n.06

**Nos. 10-1420, 10-1789**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Mar 26, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DANNY MCDOLE, | ) | |
| | ) | **ON APPEAL FROM THE** |
| Plaintiff-Appellee-Cross Appellant, | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| v. | ) | **DISTRICT OF MICHIGAN** |
| | ) | |
| CITY OF SAGINAW, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant-Cross Appellee. | ) | |

BEFORE:    MOORE and GRIFFIN, Circuit Judges; and QUIST, Senior District Judge.[*]

QUIST, District Judge.

This is an appeal from a jury verdict in favor of Plaintiff Danny McDole. Defendant City of Saginaw terminated McDole following an internal affairs investigation led by Sergeant Anjanette Tuer, regarding an incident involving McDole and his subsequent conduct. The jury found that by terminating McDole's employment the City of Saginaw discriminated against McDole because of his race, and awarded McDole $1,000,000. For the reasons set forth below, we affirm.

## BACKGROUND

On February 10, 2006, Defendant, the City of Saginaw (the "City"), terminated Plaintiff, Danny McDole ("McDole"), from his position as a police officer. McDole, an African American,

---

[*] The Honorable Gordon J. Quist, United States Senior District Judge for the Western District of Michigan, sitting by designation.

filed suit. The crux of McDole's discrimination complaint alleges that Sergeant Anjanette Tuer, who conducted the internal investigation of the event, repeatedly demonstrated a racial bias against him.

The investigation that led to McDole's firing arose out of an event involving McDole that occurred on October 14, 2005. According to McDole,[1] while driving to work on October 14, 2005, a sport utility vehicle ("SUV") pulled up next to his car and someone in the SUV shouted racial epithets at him and threw two bottles at his vehicle. The SUV kept pace with McDole's vehicle, slowing down and speeding up with it. McDole said that one of the passengers was apparently intoxicated and hanging out of a window. McDole turned on his dome light to reveal his police uniform to the passengers in the SUV, which only escalated the situation. When the SUV cut him off, McDole exited his vehicle with his weapon drawn, and he identified himself as a police officer. The passengers in the SUV expressed concern that McDole was a police officer and shouted requests that he not shoot them. The SUV then sped off. McDole was able to obtain the SUV's license plate number. Shortly thereafter, while continuing to work, McDole said that the SUV returned and followed his vehicle closely. Subsequently, McDole and other police officers located the driver of the vehicle and took him to jail. The criminal charges against the driver and a passenger were later dismissed.

In response to a letter from the criminal defense attorney representing one person in the SUV and a letter from Saginaw County's prosecuting attorney, an investigation of the incident commenced. Sergeant Allan Ogg of the Michigan State Police conducted a criminal investigation,

---

[1] McDole completed a police report after the events occurred.

and Sergeant Tuer of the City's police department conducted the internal investigation.  According to Tuer and the City's police chief, Gerald Cliff, Ogg's criminal investigation proceeded jointly with Tuer's administrative investigation.

According to witnesses and as revealed during the internal investigation,[2] Alejandro Ornelas drove the SUV, Ty Burris was the front passenger, and Michael Canda was a passenger in the rear of the vehicle.  The SUV tapped on its brakes when another vehicle closely followed, and Burris threw a water bottle out of the window.  The driver of the other vehicle, a police officer (McDole), swore at them and demanded that they pull over as he pointed a gun at them.  The officer threatened to kill them and appeared to get their license plate number.  Later in the evening, that officer, along with other officers, arrived at the same bar Ornelas and Burris were patronizing.  McDole handcuffed Ornelas and walked him to the police car.  Burris exited the premises from the rear.  More than one witness reported seeing McDole punch Ornelas in the face and close the door on Ornelas' legs.  No witness indicated that Ornelas resisted in any way.  At the jail, the nurse observed that Ornelas had a chipped tooth and cut lip.  At least one officer observed McDole come to the booking area, review Ornelas' booking sheet, and, at a minimum, attempt to get Ornelas' attention, if not threaten him.  Additionally, Burris subsequently received threatening telephone calls at his personal phone number.  In fact, Burris retained recordings of those messages.  In his deposition, McDole acknowledged that

---

[2] McDole disputes some aspects of this description, but this recitation of the events summarizes the facts as presented in Tuer's report on the incident.

he left some of those messages, some of which recorded simply his breathing. The last message on the tape, which McDole admitted to leaving, stated as follows:

> Hey I'm stallin for ya mutha fucker, I'm still here, I'm still here, I'm gonna get you mutha fucker, I promise I will get your fuckin ass you mutha fucker fuck.

The investigation found that McDole provided several inconsistent statements. Some of these inconsistencies involved which vehicle caused the other vehicle to stop, who left the scene first, the proximity of McDole's gun to Burris, and how many bottles hit McDole's vehicle. Other witnesses also contradicted McDole's assertions that he did not go into the bar to detain Ornelas, that he had no further contact with Ornelas after placing him in the squad car, and that he did not strike Ornelas. McDole did admit that he intended to intimidate Ornelas by visiting him at the jail and that he made four inappropriate phone calls to Burris. Tuer's report concluded that McDole had violated several general orders of the police department, including his obligation to be truthful to his superiors, to treat persons in custody appropriately, and not to use more than reasonable force.

On December 19, 2005, the City's officer of employee services referred McDole to an Employee Assistance Program ("EAP"). According to McDole's deposition, Tuer directed him to make those arrangement because he was an "angry black male." When McDole hesitated to make the arrangements, Tuer contacted the EAP program and mandated that McDole attend the program. The then-program coordinator of the EAP program found this referral somewhat out of the ordinary because, in her assessment, McDole's circumstances were not as dramatic as others who had been sent for psychological evaluations. During this time, McDole was placed on administrative leave.

4

On January 3 and 6, 2006, Dr. Zaroff, a psychologist, evaluated McDole and concluded that he met the criteria for post-traumatic stress disorder ("PTSD"), mild severity. McDole reported sleeplessness and nightmares related to the incident. The psychologist gave a good prognosis for recovery, which made McDole likely to be fit to return to duty after a brief course of therapy. Without the therapy, though, the psychologist allowed for the possibility that his judgment would be impaired and that he would continue to experience disturbances in his sleep. According to the EAP program coordinator, post-traumatic stress can affect decision-making abilities. The EAP coordinator believed that McDole should not have participated in arresting Ornelas.

Police Chief Cliff, Deputy Chief Martin, Personnel Director Ralph Carter, Sergeant Tuer, and City Attorneys Tom Fancher and Michelle Allen (collectively the "decisionmakers") held a conference after the conclusion of both investigations. Chief Cliff described the decision to end McDole's employment as the "result" of that conference. Afterwards, Carter recommended to the city manager that McDole's employment be terminated. Tuer described her role as participating in a discussion and presenting the findings of her report, but not making any recommendation. According to Deputy Chief Martin, he provided input on the extent of punishment and he suggested a "severe suspension" of not less than ten days. Chief Cliff maintained that he did not know of McDole's diagnosis of PTSD at the time of the decision to end McDole's employment, but admitted that the personnel director, Carter, would have had that information. The EAP program coordinator stated that she discussed the PTSD results with Carter before the City ended McDole's employment. Carter did not discuss the EAP evaluation or PTSD results with any of the decisionmakers.

According to the city manager, he reviews recommendations regarding personnel actions for procedural compliance. He generally agrees with the recommendation if it complies with the collective bargaining agreement. With respect to McDole, the city manager did not recall specifics regarding the situation, although he remembered talking to McDole and he did not recall any reference to a purported racial bias by Tuer during his conversation with McDole. On February 10, 2006, the City ended McDole's employment, based on the findings of the internal investigation.

Almost a year later, on February 7, 2007, an arbitrator decided whether McDole's termination was proper under the police officer union's collective bargaining agreement. The arbitrator found that the City's decision to end McDole's employment was proper and that McDole was terminated with "just cause." The arbitrator's decision does not refer to any alleged racial bias by Tuer.

In the instant action, however, McDole alleged that Tuer acted against him based on a racially discriminatory animus. He described several racial remarks that Tuer allegedly made during his employment. McDole said that Tuer observed, apparently in the context of working on a prostitution sting operation, that only African-American men approached her and that no Caucasians did. Also, McDole said that Tuer allegedly demanded that his "black ass" contribute to a fund for a holiday party that she had organized but that he did not attend. One time, he said, Tuer told him how a book, selected by Oprah's Book Club, about a black slave who appeared white, had resonated with her. Tuer then allegedly expressed her view that, just as in that book, a white person would always be in an authority position over a black person and that, despite McDole's potential, he would never advance in the police department. Moreover, according to McDole, Tuer stated that an African-

6

American could not advance in the police department in light of prior police-department scandals in the department involving African-American leadership. At another time, McDole alleges that Tuer reiterated the view that he would not advance because of his race and her belief that members of his race cannot and will not advance to positions of authority.

McDole also claimed that Tuer told him that she preferred to have television cameras capture an African-American officer making a particular arrest for publicity reasons, despite the fact that the arrestee was quickly released without citation. McDole also remembered a situation when Tuer allegedly told a suspect to "shut [his] black ass up." Tuer allegedly expressed the view that the only white women who date black men are overweight and are "trash." McDole also asserted that Tuer once said that she would never date a black man.

Once, while off-duty, McDole, Tuer, and two others allegedly attended an event at a sports arena, at which Tuer purportedly observed that McDole should "watch his back" because no other African-Americans were in attendance. According to McDole, Tuer, who was allegedly drunk, told him that he would witness "white power" on Monday morning; the following week, McDole said that three internal investigations pending against him had been deleted. On another occasion, during roll call, Tuer allegedly asked McDole why he was not sitting with "his people," which she clarified meant black people.

The only other witness to testify to Tuer having made any inappropriate remarks was a former police officer, Patrick Shaltry. Shaltry testified that Tuer used the word "nigger" and referred to McDole's mother as a "moolie" when Tuer and Shaltry saw her in a restaurant. Shaltry was also

terminated for misconduct and filed his own lawsuit against the City for discrimination based on race.

McDole said that he complained to his superiors about some of Tuer's conduct and remarks. According to McDole, his superiors made clear their disinterest in his complaints and stated in his evaluations that he complained that others were "out to get him."

McDole filed suit against the City, alleging employment discrimination against him based on race, in violation of Title VII and Michigan state law, and also alleging disability discrimination, in violation of Michigan state law. The district court granted summary judgment on McDole's disability discrimination claim. The race discrimination claims proceeded to a jury trial, at the conclusion of which the jury awarded McDole $950,000 in economic damages and $50,000 in non-economic damages.

### ANALYSIS

The City did not file any pre-judgment or post-judgment motions pursuant to Federal Rule of Civil Procedure 50. The City did file a motion for a new trial pursuant to Rule 59. A failure to raise a Rule 50 post-judgment motion bars this Court from directing the district court to enter judgment contrary to the one it had permitted to stand. *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 218, 67 S. Ct. 752, 756 (1947). In the event we find any reversible error, the City's relief would be limited to a new trial.

Moreover, in the event this Court finds any mistakes made by the district court, jury instructions can cure the defect. "Although prejudice that affects the fairness of a proceeding can

certainly be grounds for a new trial, when such prejudice is cured by instructions of the court, the

motion for a new trial should be denied." *Holmes v. City of Massillon*, 78 F.3d 1041, 1046-47 (6th

Cir. 1996) (citations and internal quotations omitted).

**I. The district court did not err by admitting evidence of McDole's EAP evaluation and McDole's diagnosis of PTSD.**

Prior to trial, the City filed a motion in limine seeking to exclude evidence of McDole's EAP

evaluation and the PTSD diagnosis by arguing: a) it was not relevant; and b) it was highly

prejudicial. The district court ruled as follows:

> At this point, Plaintiff has not shown that either the evaluation or diagnosis of PTSD is relevant beyond the allegation that Defendant required Plaintiff to undergo the evaluation because he was an "angry black man." Accordingly, to the extent that Plaintiff does not show that either piece of evidence is probative of race discrimination at trial, the evidence will be excluded under Federal Rule of Evidence 402.

(R. 33 at 7.)

At trial, the district court allowed the evidence, stating:

> The court is satisfied that based on the connection between the initial references . . . to race at the inception of the direction to the EAP, and the fact that results of the EAP were shared with the decision makers is enough to get it within the realm of basic relevance.

(R. 174 at 5.)

The City first argues that the EAP evaluation and diagnosis of PTSD are not relevant because

the City never established that the City normally, if ever, considered such information in making

employment decisions. Therefore, the City argues, knowledge of the PTSD diagnosis is not

probative since it can only be used as evidence of race discrimination if the City considered such information with other similarly situated employees, which he did not show.

The City also argues that the evidence should have been excluded under Federal Rule of Evidence 403. In sum, the City says that the jury was introduced to the argument that McDole's punishment was too severe because: a) the City was partially responsible for the incident by sending McDole to assist in the arrest of Ornelas; and b) the City should have considered the PTSD when determining the severity of McDole's punishment. These emotional considerations, the City argues, have nothing to do with McDole's race discrimination claim since the severity of McDole's punishment was not at issue. The City also argues that the jury instructions did not cure prejudice resulting from the jury hearing inadmissible evidence. *See United States v. Blakeney*, 942 F.2d 1001, 1030-31 (6th Cir. 1991) (While "properly prepared curative instructions are often sufficient to cure any prejudice resulting from the jury hearing inadmissible evidence, . . . curative instructions do not cure all prejudicial problems").

Evidentiary rulings are reviewed for an abuse of discretion, and a district court's determination will be reversed only if the abuse of discretion caused more than harmless error. *Maday v. Pub. Libraries of Saginaw*, 480 F.3d 815, 819 (6th Cir. 2007) (citation omitted). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Tobin v. Astra Pharm. Prods.*, 993 F.2d 528, 542 (6th Cir. 1993) (citation omitted). More than harmless error means that the evidence would have caused a different outcome at trial. *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998); *see also* Fed. R. Civ. P. 61.

"Relevant" means the evidence has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. "The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (citing *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)).

Even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. "'Unfair prejudice' means an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Whittington*, 455 F.3d at 739 (citation and quotation omitted). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.* (citation and quotation omitted).

A.  The district court did not abuse its discretion.

The district court did not abuse its discretion by admitting the evidence of the EAP evaluation and the PTSD diagnosis. As the district court noted, it is not difficult to see how this evidence meets the minimum threshold of relevance. That the EAP evaluation occurred makes it more likely that Tuer made the "angry black man" comment to McDole regarding the need for an EAP evaluation. Moreover, testimony showed that Carter and Tuer knew of the EAP evaluation and the PTSD diagnosis, but withheld it from the decisionmakers. Thus, it allowed McDole to argue that the City

did not consider the EAP evaluation or PTSD diagnosis, unlike other employees similarly situated, where the decisionmakers considered all of the relevant circumstances.

Contrary to the City's argument, Chief Cliff testified that EAP evaluations were utilized "quite often" to ensure that the disciplinary members did not overlook anything. Furthermore, Carter did not dispute receiving the PTSD diagnosis and he also testified that he did not share the reports when he met with the decisionmakers several weeks later to terminate McDole's employment. On top of that, Chief Cliff testified that the EAP evaluation and diagnosis of PTSD could have had an impact on the managers' decision to terminate McDole's employment. All of this testimony makes the evaluation and diagnosis highly probative because it suggests that the City normally considered this type of information when disciplining employees, but did not in McDole's case, and ultimately terminated McDole on some other basis. Whatever prejudicial and emotional effect the diagnosis of PTSD had on the jury cannot be said to be *unfair* prejudice that outweighs its probative value.

Therefore, the district court did not commit "clear error" by finding the evidence relevant, nor did the district court, viewing the probative value of the evidence in the light most favorable to McDole, abuse its discretion by not excluding the evidence under Rule 403.

B. No prejudice

Second, had the district court committed any error, the jury instructions cured any defect. The district court provided the following instruction to the jury:

> An employer may terminate an employee for misconduct, even if the conduct is a manifestation of an employee's medical condition. However, if you find that it was the ordinary procedure of the defendant to consider such information when making employment decisions, evidence the plaintiff was treated differently may

support an inference of discrimination to the extent the difference in treatment can reasonably be attributed to race.

(R. 119 at 117-18.)

This instruction informed the jury that even if McDole's actions were the result of his PTSD, the jury should not base their decision on their empathy for McDole. Second, the instructions informed the jury to consider the PTSD in deciding whether the City discriminated against McDole *only if* the jury first found that the City normally considered that type of information. The jury was therefore charged to first find the PTSD evidence relevant before considering it, and then it was told for what purposes it should consider the evidence. Thus, the district court's limiting instruction effectively addressed the City's concerns that this evidence led to a decision based upon "irrelevant" evidence or an impermissible "emotional" basis.

II.     **The district court did not err by admitting evidence of allegedly disparate treatment.**

Before trial, the City moved in limine to exclude evidence regarding assault allegations made against Officers Bickel and Bell in a lawsuit filed against them. The City argued that the assault allegations were not sufficiently similar to the misconduct for which the City terminated McDole to be relevant. The district court did not immediately rule on the motion and said that the admissibility of the evidence remained open. The district court allowed testimony from McDole and Chief Cliff regarding the incident to determine whether the facts surrounding the incident were similar to that of McDole's termination.

The City argues that the assault allegations were admitted through improper questioning and hearsay. Additionally, the City says that Bickel and Bell are not comparable in all relevant aspects, and therefore cannot be considered "similarly situated" to McDole. Specifically, the City says that *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000), and *McMillan v. Castro*, 405 F.3d 405 (6th Cir. 2005), establish that employees are not similarly situated for purposes of establishing disparate treatment where they are disciplined by different decisionmakers. Here, neither Tuer, nor Chief Cliff, had any involvement in any decision regarding Bickel and Bell. Furthermore, the City alleges that the circumstances surrounding the Bickel and Bell incident are markedly different from McDole's situation, and thus cannot be compared.

First, contrary to the City's argument, this circuit does not have an inflexible requirement that employees must have had the *same* decisionmaker to be "similarly situated." *McMillan*, 405 F.3d at 414. Additionally, beyond having similar decisionmakers, whether Bickel and Bell were similarly situated to McDole was a question that the jury could decide after hearing the testimony. In fact, the district court provided instructions to the jury regarding this matter. (*See* Part III, *infra*.)

Second, the district court did not abuse its discretion by allowing evidence, via testimony from Chief Cliff (R. 116 at 79-81) and McDole (R. 115 at 17-19), regarding the Bickel and Bell incident. When the City objected to the improper form of questions, McDole's counsel laid the foundation and altered the form of his question. Then, when McDole finished questioning each of the witnesses regarding this matter, the City never moved to strike the evidence on the basis that Bickel and Bell did not have similar circumstances, thus not preserving the issue.

14

Finally, the district court cured any prejudice that occurred through improper questioning

with the jury instructions.  The court instructed the jury as follows:

> The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that have been permitted into evidence and the stipulations that the lawyers have agreed to.  Nothing else is evidence.
>
> The lawyers' statements and arguments are not evidence.  Their questions and objections are not evidence.  My rulings are not evidence.  And my comments and questions are not evidence.

(R. 119 at 106.)

This instruction cured the defect, if any, due to improper questioning by McDole.

The district court did not abuse its discretion and a new trial is not warranted due to the

introduction of assault allegations regarding Bickel and Bell.

**III.    The jury instructions do not warrant a new trial.**

A.  "Similarly situated" Instruction

The City argues that the district court committed reversible error in instructing the jury

regarding whether other employees were to be deemed "similarly situated" to McDole.  The district

court instructed the jury as follows:

> The plaintiff does not have to produce direct evidence of intentional discrimination.  Intentional discrimination may be inferred from the existence of other facts.  For example, evidence that other employees engaged in conduct that was similar to the plaintiff's conduct and were disciplined by similar decision makers as the plaintiff may support an inference of discrimination to the extent that the difference in treatment can reasonably be related to race.

(R. 119 at 117.)

15

The City argues that the district court erred because "[b]y requiring only <u>similar</u> conduct and <u>similar</u> decisionmakers, the instruction established a broader group of potential comparable employees than is supported by the relevant case law." (Def.'s Br. at 40-41.) The City asked for the following instruction:

> The plaintiff does not have to produce direct evidence of intentional discrimination. Intentional discrimination may be inferred from the existence of other facts. For example, evidence that similarly situated employees were treated more favorably than the plaintiff for the same or similar conduct may support an inference of discrimination to the extent that the difference in treatment can reasonably be attributed to race.
>
> To be "similarly situated," the plaintiff and the employees to whom he compares himself do not have to be exactly the same, but they must be similar in all relevant aspects. What aspects are relevant depends on the facts and circumstances of this case. Generally speaking, relevant aspects include whether the plaintiff and the other employees dealt with the same decisionmakers, were subject to the same standards, and engaged in the same conduct without different or mitigating factors that would distinguish their conduct or the employer's treatment of them for it.

(R. 62 at 2.) On appeal, the City argues that the district court erred by not instructing the jury that the <u>same</u> decisionmakers must be involved and by not instructing the jury that comparable employees must have been engaged in the "same conduct" without such differentiating or mitigating circumstances that would distinguish their conduct or the City's treatment of them for it.

The district court's refusal to give a jury instruction is reviewed under an abuse-of- discretion standard. *Nolan v. Memphis City Schs.*, 589 F.3d 257, 264 (6th Cir. 2009). "Appellate courts do not review jury instructions for technical error." *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996). Instead, we "'review the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury.'" *Id.* (quoting *United States v. Carr*, 5 F.3d 986, 992 (6th Cir.

16

1993)). A new trial is required only when "the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).

> A refusal to give a requested jury instruction is reversible error only if three conditions are satisfied. First, the omitted instruction must be a correct statement of the law. Second, the instruction must not be substantially covered by other delivered charges. Third, the failure to give the instruction must impair the requesting party's theory of the case.

*Cox*, 75 F.3d at 234 (citing *Carr*, 5 F.3d at 992).

The City's proposed instruction is largely quoted from our decision in *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992). This language has been used in some cases in the summary-judgment context, as a standard for determining whether a plaintiff has satisfied the fourth element of a prima facie case or whether the plaintiff has shown pretext. We have never held that it is required as a jury instruction, however. Whether a plaintiff has made out a prima facie case or has shown pretext are aspects of the *McDonnell-Douglas* framework for allocating the burden of production, and we have held that a district court is not required to instruct the jury as to *McDonnell-Douglas*. *See, e.g.*, *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 446 (6th Cir. 2005). Once a discrimination case has proceeded to trial, the core issue before the jury is "whether it finds by a preponderance of the evidence that the employer intentionally discriminated against the plaintiff," not whether the plaintiff has made a prima facie case or has shown pretext. *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 597 n.3 (6th Cir. 2003) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). The City does not contend that, as a whole, the

17

district court's instructions did not properly instruct the jury as to "the ultimate issue of discrimination vel non." *Aikens*, 460 U.S. at 714.

Indeed, the district court was not required to give a "similarly situated" instruction to the jury at all. None of our sister circuits' pattern jury instructions for Title VII cases include instructions on how the jury should determine whether other employees are similarly situated. *See* Third Circuit Model Civil Jury Instructions §§ 5.0, 5.1.1, 5.1.2 (2011); Fifth Circuit Pattern Jury Instructions: Civil § 11.5.1 (2009); Seventh Circuit Federal Civil Jury Instructions § 3.01 (2009); Eighth Circuit Civil Jury Instructions § 5.01 (2012); Ninth Circuit Model Civil Jury Instructions §§ 10.1A-10.1C (2012); Eleventh Circuit Pattern Jury Instructions: Civil § 1.2.1 (2005); *see also* Michigan Civil Jury Instructions § 105.01 (2011). Although we do not have pattern civil jury instructions in this circuit, we have approved jury instructions in Title VII cases that do not contain "similarly situated" instructions. *See, e.g.*, *Williams*, 397 F.3d at 444.

Even in the summary-judgment context where it normally appears, the language in *Mitchell* is not an "inflexible requirement." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). Contrary to what the City argues, for example, there is no mandatory requirement that a plaintiff deal with the same decisionmaker as those deemed "similarly situated." *McMillan*, 405 F.3d at 414. The "same conduct without different or mitigating factors" language that the City uses in its proposed instruction is best suited for situations in which the plaintiff and a fellow employee engaged in identical conduct but with different consequences, *see, e.g.*, *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 & n.4 (6th Cir. 2002), but that is not the only situation in which the conduct of other

employees is comparable. Other cases have required conduct that is of "comparable seriousness" or is "similar in kind and severity." *Bobo*, 665 F.3d at 751. We have consistently held that "exact correlation" is not required. *Id.*; *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). When comparing employee conduct, "'precise equivalence in culpability' is not required." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 370-371 & n.9 (6th Cir. 2007) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11 (1976)).

Finally, we note that the jury instructions that were given substantially covered the omitted instruction. The jury instructions said that "similar" conduct can be compared to McDole's "to the extent that a difference in treatment can reasonably be attributed to race." This instruction covers situations where employees engaged in similar conduct, but with differentiating or mitigating circumstances. By complying with these instructions, a juror would not "reasonably" attribute the difference in treatment to race, but would do so because of the differentiating or mitigating circumstances. Thus, this language covers the instructions that the City argues that the district court omitted. Moreover, the instructions simply indicate that "similar" conduct should be compared, and jurors can decide for themselves what they believe to be "similar" conduct to that of McDole's.

Therefore, the district court did not abuse its discretion by omitting the jury instructions that the City requested.

B.       Honest Belief Rule

The City argues that the district court erred when it failed to instruct the jury regarding the "honest belief" rule. This rule is as follows:

19

> [A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made."

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citations omitted). The City contends that this rule has particular application to this case where the parties introduced conflicting evidence whether McDole assaulted Ornelas. Therefore, the City argues, whether the City mistakenly believed that the assault occurred should not have been an issue so long as it honestly believed so. Thus, City proposed the following instruction:

> If you find that the defendant honestly believed that the plaintiff committed the acts for which he was discharged, the defendant is not liable, even if the defendant was mistaken, and you must find for the defendant. The discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus, when an employee is discharged because of an employer's honest mistake, both state and federal antidiscrimination laws offer the employee no protection.

(R. 62 at 1.) The City contends that the lack of a proper instruction "allowed the Jury to give impermissible weight to its finding on the factual question of whether Plaintiff assaulted Ornelas." (Def.'s Br. at 48.)

The district court's refusal to give a jury instruction is reviewed under an abuse of discretion standard. *Nolan*, 589 F.3d at 264. "Appellate courts do not review jury instructions for technical error." *Cox*, 75 F.3d at 234. Instead, we "'review the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury.'" *Id.* (quoting *Carr*, 5 F.3d at 992).

20

 A new trial is only required when the instructions taken as a whole are misleading or give an inadequate understanding of the law. *Arban*, 345 F.3d 390 at 404.

> A refusal to give a requested jury instruction is reversible error only if three conditions are satisfied. First, the omitted instruction must be a correct statement of the law. Second, the instruction must not be substantially covered by other delivered charges. Third, the failure to give the instruction must impair the requesting party's theory of the case.

*Cox*, 75 F.3d at 234 (citing *Carr*, 5 F.3d at 992).

The district court did not abuse its discretion by omitting the honest belief rule in its jury instructions. For one, the district court thought, in its discretion, that such an instruction could have caused confusion. The district court noted that the City's justification of termination included more than just the confrontation between McDole and Ornelas at the time of Ornelas' arrest.

Moreover, the district court's jury instructions substantially covered the honest belief rule because the district court clearly informed the jury that race discrimination must be intentional:

> To prevail on his claims, the plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him because of race.

> The discrimination must have been intentional. It cannot have occurred by accident. Intentional discrimination means one of the motives or reasons for the plaintiff's discharge was race.

(R. 119 at 116.) These instructions substantially cover the honest belief rule: it does not matter whether the City mistakenly believed McDole assaulted Ornelas; it only matters if the City intentionally discriminated against McDole based upon his race. Furthermore, the district court's "mixed motive" instruction substantially covers the honest belief rule. The mixed motive instruction instructed the jury to not find any damages for McDole if the City would have terminated McDole

regardless of his race. That is, if the City mistakenly believed McDole hit Ornelas, and based its decision on this incident, then the jury should not find any damages for McDole. This instruction substantially covered the honest belief rule, and avoided the confusion that concerned the district court.

### IV. The district court did not err by failing to apply collateral estoppel to McDole's state-law claim in order to bar re-litigation of factual issues decided in McDole's arbitration grievance.

Upon being terminated, McDole filed a grievance which was submitted to arbitration pursuant to his collective bargaining agreement. In the arbitration, the police-officer union represented McDole. The scope of the arbitration was limited to determining whether McDole's termination violated the collective bargaining agreement.

The district court held that McDole was not barred from re-litigating factual issues decided in the arbitration of his grievance pursuant to a labor agreement. The district court made this finding with respect to both McDole's federal and state-law claims. The City challenges only the district court's finding with respect to McDole's state-law claim.

"[T]he availability of collateral estoppel is a mixed question of law and fact which this court reviews de novo." *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005) (citation and quotation omitted). Upon review, the district court's analysis of this issue is correct.

In *Arslanian v. Oakwood United Hospitals, Inc.*, 618 N.W.2d 380 (Mich. Ct. App. 2000), the court concluded that collateral estoppel does not preclude litigation of factual issues decided in a labor arbitration governed by a collective bargaining agreement when the plaintiff subsequently

22

brings a lawsuit alleging violations of state civil rights statutes. *Id.* at 385.[3] This conclusion is

determinative on the issue before us.

As the district court noted, the two cases that the City relies on, *Porter v. Royal Oak*, 542

N.W.2d 905 (Mich. Ct. App. 1995), and *Cole v. West Side Auto Employees Federal Credit Union*,

583 N.W.2d 226 (Mich. Ct. App. 1998), have meaningful distinctions. Here, unlike those cases, the

plaintiff was represented by a union in the prior arbitration, the prior arbitration was limited to the

collective bargaining agreement, and the plaintiff subsequently alleged civil rights claims. Indeed,

as *Arslanian* noted, "the difference between arbitration agreements arising in the context of a

collective bargaining agreement and those arising out of individual employment contracts" is critical.

*Arslanian*, 618 N.W.2d at 382.

> **V.      The district court did not abuse its discretion when it admitted certain hearsay
> statements.**

The City argues that the district court abused its discretion when it admitted several

statements made by McDole while he testified. McDole testified that other officers told him:

Ornelas and his family were like a "drug family" with a "huge entourage" and a "crime syndicate

reputation" (R. 115 at 100); as a drug family, "[t]hey have influence with people that want to make

a name and they use these people to do their dirty work" (*id.* at 101); and, Ornelas was a "huge crime

---

[3] This Court also follows this approach with respect to federal claims. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 547 (6th Cir. 2008); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S. Ct. 1011 (1974) (Title VII claims); *Gomez-Mesquita v. City of Detroit*, No.06-12844, 2007 WL 2225859 (E.D. Mich. Aug. 2, 2007) (finding collateral estoppel did not apply to either plaintiff's federal or state statutory civil rights claims when the prior arbitration proceeding was brought on behalf of the plaintiff by the union).

figure" (*id.*). The City contends that the district court's failure to strike this testimony "resulted in the Jury hearing prejudicial information about a central witness in the case through inadmissible hearsay." (Def.'s Br. at 56.)

Initially, the City does not put forth any argument why the admission of this hearsay led to more than harmless error. The hearsay regarding Ornelas is very tangential to the case; really, the entire event involving Ornelas is tangential to the question whether McDole was terminated based on his race. Second, as the district court noted, the statements were not being used to prove that Ornelas was in fact a huge crime figure in the community; it was being used to show McDole's state of mind regarding these people. Therefore, since they were not used to prove the truth of the matter asserted, the statements were not hearsay, and thus admissible. Third, even if the statements were hearsay, the district court correctly allowed the statements under Federal Rule of Evidence 801(d)(2), as the officers are agents of the city.

The City also argues that the district court improperly allowed McDole to testify regarding statements made by Christine Brennan, the EAP program coordinator. McDole testified that Brennan told him that the EAP referral was "fishy," and that Tuer called Brennan and said that she wanted a "negative" report and that McDole is "not going to come off as a nice guy, he's a negative guy." (R. 174 at 115-16.)

Again, the City does not opine how striking this testimony would have affected the outcome of the trial. Even if these particular statements were excluded, McDole testified to a plethora of other statements that Tuer allegedly made regarding McDole's race.

Second, the district court did not abuse its discretion by finding that the statements fell within Federal Rule of Evidence 801(d)(2). In its discretion, after hearing arguments from both parties, the district court determined that Ms. Brennan was a "representative" of the City, and therefore her statements fell within Rule 801(d)(2). (R. 174 at 8-15); *see* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is offered against a party and is made by the party's agent); *Beck v. Haik*, 377 F.3d 624, 639-40 (6th Cir. 2004) (finding that courts have held contractors and advisors to fall within the "agency" relationship contemplated by Rule 801(d)(2)(D)) (reversed on other grounds).

**VI.      The district court did not abuse its discretion when it allowed an unlisted witness to testify.**

At trial, McDole called witness Ruben Vasquez, a former fellow police officer of McDole's. The City objected to McDole calling Vasquez because McDole had failed to list Vasquez on any witness list, including the Joint Final Pretrial Order. Vasquez testified regarding two matters. First, Vasquez's testimony provided a link in a chain of evidence regarding whether Tuer had knowledge, prior to McDole's termination, that Ornelas had used racial slurs when referring to McDole after the "incident" occurred. Vasquez linked the testimony of Denise Dutoi to Tuer. Denise Dutoi testified that she saw Ornelas in a bar after the incident and Ornelas said, referring to McDole, "Fuck that, fuck that nigger." (R. 117 at 57.) Moreover, Dutoi testified she relayed this information to Vasquez. (*Id.* at 72.) However, Dutoi's testimony was only relevant if Tuer had knowledge of these facts prior to McDole's termination. Vasquez testified that he informed Tuer of Ornelas' racial slurs regarding McDole before McDole's termination. (*Id.* at 102-104.) Second, Vasquez testified that he provided Tuer with information regarding McDole's PTSD. (R. 118 at 7.)

Under Federal Rule of Civil Procedure 26(a)(3), a party must provide to the other parties and file the names of witnesses it may present at trial, and must separately identify those witnesses it expects to present and those it may call if the need arises. If a party fails to identify a witness as required by Rules 26(a) and (e), the party is not allowed to use that witness at trial unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). A district court's decision on Rule 37 sanctions is reviewed for abuse of discretion. *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003).

The district court did not abuse its discretion by finding that the failure to list Vasquez as a witness was substantially justified. With regard to the first portion of Vasquez's testimony, the district court heard McDole's counsel state that, immediately before calling Vasquez, counsel had just learned "five minutes" earlier of Vasquez's relevant testimony. (R. 117 at 75.) Furthermore, McDole's counsel stated that he did not know of Vasquez earlier because neither Tuer nor Cliff mentioned receiving this information from Vasquez in their depositions. (*Id.*) Thus, the district court did not think that Vasquez's testimony could have been reasonably anticipated. Moreover, before allowing Vasquez to testify, the City's counsel informed the district court of the subject of his testimony, and the court found it relevant to the case. (*Id.* at 76.) The court considered all of this information, and in its discretion, decided that McDole's failure to list Vasquez as a witness was substantially justified. The district court's gathering of information to make an informed decision does not amount to an abuse of discretion.

Nor did the district court abuse its discretion by allowing Vasquez's testimony that he informed Tuer of McDole's PTSD diagnosis. McDole's counsel said that he could not have anticipated this testimony prior to trial. (R. 118 at 2.) Moreover, he informed the district court of the testimony prior to Vasquez testifying about it. (*Id.* at 3.) The district court found it relevant because the testimony suggests that Tuer knew of the PTSD diagnosis, but hid it from the decisionmakers who primarily relied on Tuer's report for McDole's termination. (*Id.* at 5.) The court considered argument from both sides, including McDole's counsel's reason for not complying with Rule 26, and, in its discretion, found McDole's reason for not listing the witness substantially justified. Therefore, the district court did not abuse its discretion in allowing Vasquez to testify.

**VII.     The district court did not err when it did not reduce the jury's future damage award to present value.**

The City objected to the district court's judgment because it did not reduce the jury's award of future damages to present value. (R. 71.) The City argues that the jury award of $950,000 in economic damages should be reduced to $798,192, to reflect the present value of future damages.[4] Notably, the verdict form does not distinguish between future damages and past damages and the jury instructions did not inform the jury to reduce future damages to present value. Additionally, before the verdict, the City never raised an objection regarding the verdict form or the jury instructions on the issue of reducing future damages to present value. The district court overruled the objection and entered judgment without reducing any portion of the award to present value.

---

[4] The parties do not dispute that, if the Court were to discount the future damages to its present value, $798,192 would be the correct amount.

Future damages, whether under Michigan or federal law, must be reduced to present value. *See* MICH. COMP. LAWS. § 600.6306; *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1235 (6th Cir. 1996); *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999) (explaining that the Sixth Circuit has been "vigilant in correcting juries' failures to discount damages to present value").

In *Rodgers v. Fisher Body Division*, 739 F.2d 1102, 1106 (6th Cir. 1984), this Court *sua sponte* held that the district court committed plain error by failing to instruct the jury to discount a future damage award to present value. In *Rodgers*, neither party proposed a jury instruction that an award of future damages must be reduced to present value and neither party objected to the trial court's instructions on compensatory damages. *Id.* Furthermore, the court remanded by raising the issue *sua sponte* because of the "plain error" that was obvious due to the "shockingly large" verdict and said that the award affected the fairness and integrity of the judicial process. *Id. But see Kokesh v. Am. Steamship Co.*, 747 F.2d 1092, 1095-96 (6th Cir. 1984) (the appellate court need not correct such an error *sua sponte*).

*Kokesh* clarified that whether the failure to give such an instruction amounts to plain error depends on the specific circumstances of each case. *Kokesh*, 747 F.2d at 1096; *Hawthorne Educ. Servs., Inc. v. Friedman*, No. 98-2235, 2000 WL 799339, at *5 (6th Cir. June 8, 2000) (unpublished opinion); *Pulliam v. Shelby Cty.*, 902 F.Supp 797, 804 (W.D. Tenn. 1995). In *Kokesh*, decided four months after *Rodgers*, neither party objected to the jury instructions omitting an instruction to discount a future damage award and, as a result, the jury award was not discounted to present value.

28

 The court noted that a trial strategy is to have a simple verdict form without requiring the jury to calculate present value, or another strategy is to forego putting an expert on the stand to testify regarding damages. *Kokesh*, 747 F.2d at 1095-96. The court went on to say, "[w]e see no reason to question the jury instructions solely because they did not include a charge on reducing future damages to present worth, an instruction which neither party requested or evidently desired." *Id.* at 1096. Ultimately, the court said that, while the damages award was "generous, it was supported by sufficient proof in the case, and was not shockingly large," and thus "no error, plain or otherwise, produced it." *Id.*

No party objected to the jury instructions or verdict form prior to the verdict and, thus, the plain error standard applies. The district court did not commit plain error. First, like *Kokesh*, no error produced the award because the jury verdict was supported by the evidence that McDole's expert put forth. The award of $950,000 for economic damages corresponds to the amount of earnings McDole's expert projected McDole would have earned had he continued working for the City through the age of forty-eight, the age McDole testified that he wanted to retire. Second, unlike *Rodgers*, the award was not "shockingly large."

Therefore, we hold that the district court did not commit plain error by refusing to discount the jury award to its present value.

**VIII.** **The district court did not err by not awarding attorney fees to McDole.**[5]

Two authorities are important to resolve this issue. First, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b). Second, United States District Court for the Eastern District of Michigan Local Rule 54.1.2(b) provides:

> A motion for award of attorney fees shall be supported by a memorandum brief as to the authority of the court to make such an award, . . . an affidavit of counsel setting out in detail the number of hours spent on each aspect of the case, the rate customarily charged by counsel for such work, the prevailing rate changed in the community for similar services, and any other factors which the court should consider in making the award.

E.D. Mich. LR 54.1.2(b). In essence, the Local Rule allows the district court to calculate the *lodestar* amount.

With these authorities in mind, the following events occurred regarding McDole's post-verdict motion for attorney fees.

First Motion for Attorney Fees

- March 3, 2009, the jury returned a verdict in favor of McDole awarding him $1,000,000.

- March 13, 2009, McDole filed a motion for attorney fees. (R. 68.) He sought $335,108.91, the amount his counsel would have been paid pursuant to their

---

[5] This is the sole issue on McDole's cross appeal–appeal number 10-1789.

contingency agreement. He provided no supporting information to calculate the *lodestar* amount, or law to support his request for the contingency amount.

- March 30, 2009, the district court granted McDole's stipulated request for an extension of time, and directed McDole to comply with Local Rule 54.1.2(b) and to provide legal support for his contingency amount request.

- McDole replied but still did not provide the requisite information required in Local Rule 54.1.2(b).

- The district court denied McDole's motion for attorney fees because McDole did not provide sufficient information regarding factors relevant under either federal or state law for the calculation of an award of attorney fees. (R. 81.)

Renewed Motion to Reconsider

- December 15, 2009, McDole filed a renewed motion for attorney fees. (R. 99.) McDole sought a rate of $750/hour, which "is consistent with a one third contingency fee." (*Id.* at 13.) He still did not comply with Local Rule 54.1.2(b).

- January 7, 2010, McDole filed a reply to the City's response, and included, for the first time, an affidavit from an outside attorney stating the "fees and costs sought is reasonable" based upon his professional knowledge of counsel's capabilities. (R. 102.)

- February 8, 2010, the district court struck the affidavit, primarily because it was presented for the first time in a reply brief, which did not furnish the City an opportunity to respond.

- March 5, 2010, the district court denied McDole's renewed motion, explaining that McDole once again did not provide the information that the court needed to make a reasonable calculation of attorney fees. (R. 108.)

Motion for Evidentiary Hearing on Renewed Motion

- March 5, 2010, the district court denied the motion because McDole still had not submitted the required information of "the rate customarily charged by counsel for such work" and "the prevailing rate charged in the community for similar services."

Another Motion for Attorney Fees

- March 10, 2010, McDole filed a motion for attorney fees pursuant to Mich. Comp. Laws § 37.2802, which grants a court the discretion to award "reasonable attorney fees" when appropriate.

- The City responded by arguing McDole did not seek leave of court to file this *third* motion for attorney fees and did not establish good cause for previous noncompliance with Local Rule 54.1.2(b).

- The district court denied the motion (R. 110), and declined to consider McDole's arguments because McDole did "not advance[] any rationale to support the belated

submission of new materials and advancement of new arguments." The district court

stated:

> Plaintiff made a decision to seek the full amount of his contingency fee as an attorney fee award while refusing to provide the detailed information that would allow the Court to calculate a lodestar award. Notably, Plaintiff not only pursued this strategy in his initial motion for attorney fees, he continued to pursue it after the Court specifically requested the detailed information to be provided in a sur-reply brief and again in his renewed motion for attorney fees. Having made a decision to seek an amount equal to his contingency fee and to refuse to comply with the local rule, Plaintiff is not entitled to yet a third "bite at the apple."

(R. 124 at 7.)

A district court's ruling with regard to a motion for attorney fees is reviewed for abuse of discretion. *Chernin v. Welchans*, 844 F.2d 322, 330 (6th Cir. 1988). As McDole points out, a prevailing party in a civil rights action should ordinarily, absent special circumstances, be awarded attorney fees. *See Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759, 109 S. Ct. 2732, 2735 (1989); *Morscott v. City of Cleveland*, 936 F.2d 271, 273 (6th Cir. 1991).

Here, special circumstances existed. First, McDole refused on multiple occasions to provide a single motion with all of the appropriate information to calculate a reasonable *lodestar* amount. Second, McDole put forth no argument that the district court erred in declining to consider his final motion for attorney fees due to a lack of "good cause" for not complying with the pertinent rules in prior motions. Thus, this Court, like the district court, does not have the requisite information before it to calculate a reasonable amount if it wished to do so. Third, providing the requisite information to the district court in order to comply with Local Rule 54.1.2 is a basic task for an attorney. It is

special and rare for a prevailing party to go to such lengths to refuse to comply with a court rule–especially in the face of almost assuredly being granted *some* award after such compliance. Last, contrary to McDole's numerous motions to the district court, the existence of a contingency agreement between the plaintiff and his attorney does not warrant abandoning the *lodestar* approach. *See Fuhr v. Sch. Dist. of the City of Hazel Park*, 364 F.3d 753, 762 (6th Cir. 2004). Therefore, the district court did not abuse its discretion in denying McDole's motion for attorney fees.

### CONCLUSION

On all issues, the district court is **AFFIRMED.**